UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

APR 07 2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA,

Plaintiff,

v.

1987 BOMBARDIER CL-600 TWIN JET (SERIAL NUMBER 5003 AND TAIL NUMBER XA-UFF) AND ITS INVENTORY (LOG BOOK AND MAINTENANCE BOOK),

Defendant, *In Rem*.

Case No.

Judge

22-cv-1810
Judge Charles R. Norgle
Magistrate Judge Jeffrey Cummings

**UNDER SEAL**

## VERIFIED COMPLAINT FOR FORFEITURE, *IN REM*

COMES NOW, before this honorable Court, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to the provisions of Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp.") G(2), respectfully, to bring this Verified Complaint for Forfeiture *In Rem*.

Plaintiff hereby alleges as follows:

### Nature of the Action

1. This is a civil action brought to forfeit property to the United States pursuant to 21 U.S.C. § 881(a)(4) and 18 U.S.C. § 981(a)(1)(A).

2. Based upon the facts and circumstances herein set forth, Plaintiff prays: (1) that process issue for an arrest warrant *in rem* for the defendant property; (2) that notice be given to all parties to appear and show cause why forfeiture should not be

decreed; (3) that this Court enter a judgment of forfeiture to the United States; and (4) that this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

3.   This complaint is verified by the attached Verification of Department of Homeland Security Investigations ("HSI") Special Agent Carolyn Working, which is fully incorporated herein.

## The Defendant *In Rem*

4.   The Defendant *in rem* consists of a 1987 Bombardier CL-600 Twin Jet Aircraft, Serial Number 5003, Tail Number XA-UFF ("the Jet"), along with its log book and maintenance book ("the Inventory") (collectively, "the defendant property"). The Department of Homeland Security seized the Jet on or about November 3, 2021, at the Gary International Airport in Gary, Indiana. A seizure warrant issued for the Jet on or about November 8, 2021. The Jet is currently in the custody of the Department of Homeland Security.

## Jurisdictional Statement

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1345 because this action is commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture.

6.   This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district.

**Basis for Forfeiture**

8. The Jet is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(4) because it constitutes a conveyance which was used, or was intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of a controlled substance.

9. The defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or is property traceable to such property.

**Summary of Facts**

10. According to Individual A, at the behest of Individual E, on or about September 22, 2021, Individual A received approximately $700,000 in cash drug proceeds from Sergio Blas-Hernandez in or about Gary, Indiana. That same day, Individual A concealed the money in the Jet and transported it to Toluca, Mexico.

11. According to Individual A, at the behest of Individual E, on or about October 3, 2021, Individual A received approximately $700,000 in cash drug proceeds from an unknown individual in or about Hammond, Indiana. That same day, Individual A concealed the money in the Jet and transported it to Toluca, Mexico.

12. According to Individual A, at the behest of Individual E, on or about October 5, 2021, Individual A received approximately $700,000 in cash drug proceeds

from Sergio Blas-Hernandez in or about Hammond, Indiana. The next day, Individual A concealed the money in the Jet and transported it to Toluca, Mexico.

13. According to Individual A, on or about October 18, 2021, at the behest of Individual E, Individual A received approximately $700,000 in cash drug proceeds from Sergio Blas-Hernandez in or about Hammond, Indiana. The next day, Individual A concealed the money in the Jet and transported it to Toluca, Mexico.

14. According to Individual A, on or about November 2, 2021, at the behest of Individual E, Individual A flew Sebastian Vazquez-Gamez and others via the Jet from Toluca, Mexico, to Houston, Texas. On November 3, 2021, Individual A continued the charter—flying the same individuals from Houston, Texas, to Gary, Indiana.

15. On November 3, 2021, at approximately 6:43 p.m., law enforcement observed the Jet land at the Gary/Chicago International Airport. After the Jet parked on the tarmac, at approximately 6:50 p.m., law enforcement observed Individual A open the Jet's door and speak with a Gary Airport employee, who was waiting on the tarmac.

16. Shortly thereafter, law enforcement observed the airport employee retrieve two black duffel bags, one with a white "PUMA" logo and one with a white Nike logo, from the Jet and hang them on a waiting dolly cart. The employee then returned to the Jet and retrieved a dark gray patterned suitcase and a silver suitcase from the Jet. As the employee placed the bags on the dolly, Sebastian Vazquez-Gamez and two other passengers (Individuals B and C) exited the Jet. Vazquez-

4

Gamez then turned around, and with the assistance of the Gary Airport employee and Individuals A, B, and C, slid an approximately four-foot long piece of luggage (hereinafter referred to as "the tall suitcase") out of the Jet and down the stairs to the tarmac. Based on the manner in which the tall suitcase was handled, it appeared to be significantly weighed down. The airport employee then maneuvered the tall suitcase toward the dolly.

17. After placing the tall suitcase near the dolly, the airport employee returned to the Jet and retrieved a large black suitcase (hereinafter referred to as "the black suitcase") from Individual A. Based on the manner in which the black suitcase was handled, it also appeared to be significantly weighed down. The airport employee placed the black suitcase on the dolly.

18. At approximately 6:51 p.m., the airport employee pulled the dolly cart containing all the aforementioned luggage towards the Gary Jet Center building. Vazquez-Gamez, Individual B, and Individual C followed, with Vazquez-Gamez pulling the tall suitcase.

19. At approximately 7:01 p.m., law enforcement observed a black 2020 Lincoln Navigator arrive and park in front of the Gary Jet Center at the Gary Airport. Approximately two minutes later, law enforcement observed the driver of the Lincoln, Individual D, standing with Vazquez-Gamez and two other individuals (believed to be Individual B and Individual C) just outside of the Gary Jet Center entrance/exit doors. A short time later, law enforcement observed the driver of the Lincoln appear to transfer the luggage into the rear tailgate of the Lincoln.

20. At approximately 7:07 p.m., the Lincoln departed the area, and law enforcement initiated mobile surveillance, following the Lincoln as it traveled from the Gary Airport to downtown Chicago.

21. At approximately 7:40 p.m., law enforcement lost visual contact with the Lincoln in the area of North Lake Shore Drive and East Chicago Avenue in downtown Chicago.

22. At approximately 8:31 p.m., law enforcement learned from a Gary Airport employee that the Lincoln had dropped off its passengers at a downtown Chicago hotel ("Hotel A"), located on the 100 block of East Chestnut Street in Chicago.

23. A Hotel A employee confirmed that Vazquez-Gamez, Individual B, and Individual C had checked into Hotel A. Law enforcement subsequently established physical surveillance around the vicinity of the hotel.

24. At approximately 9:10 p.m., plain-clothes law enforcement personnel in the lobby of Hotel A observed Vazquez-Gamez and Individual B walking through the lobby of the hotel. Vazquez-Gamez was pulling the tall suitcase and Individual B was pulling the black suitcase, and they exited the hotel.

25. Surveillance then observed Vazquez-Gamez standing on the sidewalk near the front of the hotel in close proximity to the tall suitcase and the black suitcase. Meanwhile, Individual B was observed walking around the area while appearing to a cell phone to take pictures of the area.

26. At approximately 9:14 p.m., law enforcement observed Vazquez-Gamez gesture towards a white 2015 Toyota Highlander bearing temporary Indiana license

plate P322612, which had just arrived on the 100 block of East Chestnut Street. The Toyota subsequently pulled over to the north side of Chestnut Street, and Vazquez-Gamez approached the Toyota while Individual B reentered Hotel A around the same time.

27. At approximately 9:15 p.m., law enforcement observed the driver of the Toyota, later identified as Rodrigo Alexis Jimenez-Perez, standing at the rear of the Toyota with Vazquez-Gamez. Jimenez-Perez and Vazquez-Gamez then loaded the tall suitcase into the open hatch of the Toyota. Based on the manner in which they handled the suitcase, it also appeared to be significantly weighted down.

28. A few seconds later, law enforcement observed Jimenez-Perez enter the driver's seat and Vazquez-Gamez enter the front passenger seat of the Toyota. The Toyota then departed the area, and law enforcement initiated mobile surveillance. Shortly after the Toyota departed Hotel A, it dropped off Vazquez-Gamez on the sidewalk in the area of East Superior Street and North Wabash Avenue, while Jimenez-Perez continued driving.

29. At approximately 9:23 p.m., law enforcement conducted an investigative stop on the Toyota on the 500 block of North Rush Street, in Chicago. Law enforcement approached the vehicle and observed Jimenez-Perez in the driver's seat. Law enforcement asked Jimenez-Perez to exit the vehicle, and he complied. Law enforcement asked Jimenez-Perez about the suitcases in the car, and he claimed to not know what was inside of them. Law enforcement then requested to look inside the suitcases, and Jimenez-Perez provided verbal consent.

30.     Law enforcement located the tall suitcase and the black suitcase in the trunk of the Toyota.  Inside both suitcases, law enforcement found in total approximately 80 brick-shaped packages wrapped in black tape, which were subsequently lab confirmed to contain cocaine.

31.     Meanwhile, law enforcement also approached and detained Vazquez-Gamez in the area of East Chicago Street and North Rush Street.  Law enforcement and Vazquez-Gamez returned to Hotel A and telephonically conferred with a Spanish-speaking law enforcement officer, and Vazquez-Gamez verbally consented to law enforcement searching his hotel room at Hotel A and provided his room key to law enforcement.

32.     Inside Vazquez-Gamez's hotel room, law enforcement found inside the silver suitcase and the black duffel bag with the white Nike logo approximately 20 brick-shaped packages wrapped in black tape, in the same manner as the bricks recovered from the Toyota, appearing consistent with kilogram bricks of controlled substances.  Law enforcement performed a field test of a sample of one of the bricks recovered by law enforcement, and it indicated that presumptive presence of cocaine, which was subsequently lab-confirmed.  Law enforcement also found in Vazquez-Gamez's room receipts from retail stores in Houston dated November 3, 2021, for the purchase of "luggage" and another "item".  Based on Vazquez-Gamez's, Individual B's, and Individual C's statements to law enforcement, as well as the items that law enforcement observed inside Vazquez-Gamez's hotel room and Individual B's and Individual C's hotel room (also searched by consent), law enforcement believes that

Vazquez-Gamez was the sole occupant and user of the hotel room in which the suitcases with the additional bricks were found.

33. Finally, under federal regulations, in order to fly an aircraft in U.S. airspace, plane owners are required to maintain logs documenting, among other things, maintenance, repairs, inspection status, status of certain components, and compliance with FAA Airworthiness Directives. Inability to produce evidence of compliance with FAA Airworthiness Directives renders a plane not airworthy. Accordingly, the Inventory facilitated the use of the Jet, as described above.

## Conclusion

34. For the reasons stated herein and in the attached verification, there is probable cause to believe that the defendant 1987 Bombardier CL-600 Twin Jet Aircraft, Serial Number 5003, Tail Number XA-UFF, was property that was used, or was intended to be used, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of controlled substances, and that the defendant property was property involved in money laundering offenses, or is property traceable to such offenses is therefore, subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(4) and 18 U.S.C. § 981(a)(1)(A).

## Prayer for Relief

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the defendant property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the defendant property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the defendant property to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Andrew C. Erskine*
ANDREW C. ERSKINE
ASHLEY A. CHUNG
Assistant United States Attorney
219 South Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-1875

| NORTHERN DISTRICT OF ILLINOIS | ) | |
|---|---|---|
| | ) | ss |
| COUNTY OF COOK | ) | |

## VERIFICATION

I, Carolyn Working, declare under penalty of perjury the following:

1. I am a Special Agent with Department of Homeland Security Investigations (HSI) and have been so employed since 2019.

2. My duties and responsibilities as a Special Agent with HSI involve the investigation of money laundering offenses, in violation of Title 18, United States Code, Section 1956, as well as violations of the Controlled Substances Act, Title 21, of the United States Code.

3. I have read the foregoing complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief.

4. This statement is based upon my own personal knowledge as well as information I have received from other agents, persons, and documents; it does not include each and every fact known to me concerning this investigation but is submitted for the limited purpose of establishing a basis to believe the property identified is subject to forfeiture.

Executed on the 7th day of April 2022, in Chicago, Illinois.

CAROLYN WORKING
Special Agent
Homeland Security Investigations